Peoples Community Bank ("the Bank") appeals from a judgment of the Barbour Circuit Court in favor of Gerald A. Helms and Johnnie P. Helms, a married couple. Because we conclude that the court's finding with regard to the Bank's security interest in certain property that the court awarded to the Helmses was erroneous, we reverse and remand.
Timothy Dawkins engaged in the business of buying and selling vehicles under the name D S Motors. D S was an unincorporated, sole proprietorship. D S obtained a line of credit from the Bank on July 30, 1999, in the amount of $51,050.65; the Bank agreed to advance funds up to that amount upon D S's request and the presentation by D S to the Bank of purchase invoices and vehicle titles. On that same day, D S executed a promissory note in the same amount in favor of the Bank. D S also entered into a security agreement with the Bank pursuant to which the Bank received a security interest in "all inventory which [D S] hold[s] for ultimate sale or lease," both presently and in the future. A separate provision in the security agreement stated that "the secured property includes, but is *Page 1064 
not limited by, the following: Inventory consist[ing] of salvage automobiles. . . ."
On August 11, 1999, the Bank filed a financing statement with the Alabama Secretary of State. That statement described the inventory in which the Bank possessed a security interest by virtue of its security agreement with D S as "inventory consist[ing] of salvage automobiles," and more fully described the inventory collateral on an attached page as all of the inventory D S held or would hold in the future for ultimate sale or lease.
In early 2001, Dawkins and Gerald Helms discussed the possibility of purchasing automobiles at auction for the purpose of repairing them and selling them for a profit. Dawkins mentioned to Mr. Helms that there would soon be two automobile auctions held in Florida, and he asked Mr. Helms if he would be interested in purchasing two vehicles with him.
A few weeks later, Dawkins contacted Mr. Helms, told him that his son was at one of the automobile auctions in Florida, indicated that some of the vehicles at the auction were about to sell at a good price, and asked if he wanted to purchase some of the automobiles with Dawkins, as they had previously discussed. Mr. Helms agreed to purchase two vehicles with Dawkins: a 2001 Lincoln Continental and a 2000 GMC truck. Dawkins and Helms agreed that Mr. Helms would pay for the purchase of the two vehicles and that Mr. Helms also would pay to have them repaired by Dawkins. After the vehicles were sold, Mr. Helms was to be reimbursed the amounts he had expended on purchasing and repairing the vehicles, and he and Dawkins would split the resulting profit. This agreement was not reduced to writing.
In late June 2001, Mr. Helms traveled to Florida with Dawkins to pay for and retrieve the two vehicles. As agreed, Mr. Helms paid for the vehicles, and the vehicles were transported to Dawkins's shop to be repaired. Shortly after they were delivered to Dawkins's shop, Dawkins began driving the Lincoln Continental and his wife and son began driving the GMC truck. Dawkins explained to Mr. Helms that the reason he and his family were driving the vehicles was "to get the kinks out of them." The bills of sale for these two vehicles named D 
S as the purchaser; the vehicles were titled in Dawkins's name individually.
In August 2001, Dawkins asked Mr. Helms if he could borrow money to purchase five vehicles at an automobile auction in Texas. According to Mr. Helms, Dawkins told him that "he had them sold to this Brian at Auto Trends in Anniston, Alabama, but he needed the money to pay for them to take them to Anniston, Alabama in order to get a price for them." According to Mr. Helms, Dawkins explained that he would return the money he borrowed after five days, because the vehicles "were already sold." Dawkins testified, however, that he did not guaranty Mr. Helms that the vehicles would be sold within five days of their purchase.
After speaking with his wife, Mr. Helms agreed to let Dawkins borrow the money, which amounted to $41,540. Before transferring the funds, the parties wrote the following agreement:
 "These vehicle[s] were purchased by D S motors and paid for by Johnnie Helms on Saturday August 25, 2001 at IAA in Houston TX. Money will be paid back to Johnnie Helms when vehicles are sold.

"Stall# Control# Amount
"531 2001 Mazda Millenia 01007708 9845.00
"878 1997 Mazda Millenia 01008808 3080.00
"341 2000 BMW 01019924 14,545.00
"66 2001 Honda Civic 0100818 8425.00
"550 1995 Tahoe 01015103 5645.00
 *Page 1065 
 "Vehicle[s] delivered to Auto Trends in Anniston, AL."
Unlike their previous oral agreement, Mr. Helms was not going to receive any of the profit from the sale of these vehicles; instead, upon the sale of the vehicles, Mr. Helms was to receive only a return of the funds that he and his wife had loaned to Dawkins to purchase the; vehicles.
After the five vehicles were purchased, they were delivered to Auto Trends in Anniston. Dawkins and Mr. Helms traveled to Auto Trends, and Dawkins spoke with Brian in Brian's office. Brian indicated that he would not purchase the vehicles.
Because they could not sell the vehicles in their current condition, Dawkins and Mr. Helms decided to have them repaired. Because Dawkins did not have the money to have them repaired, Mr. Helms agreed to pay for the repairs. Eventually, three of the vehicles were repaired.
Dawkins took the title certificates to the five vehicles that were purchased in Texas to Mrs. Helms for her to hold. All of those vehicles were titled in the name of D S, except the 1997 Millennia. The record is unclear whether the 1997 Millennia was titled in the name of D S or in Dawkins's name individually.
In August 2001, Dawkins placed some of the above-described seven vehicles at a location in Enterprise, Alabama, that sold used vehicles. Approximately four weeks later, because the vehicles did not sell at the Enterprise location, Dawkins moved the vehicles to a location in Luverne, Alabama, in hopes that they would sell.
On August 17, 2001, the Bank made an advance to Dawkins in the amount of $25,200, which, according to the testimony of the president of the Bank, was "on the Lincoln Continental, 2000 Land Rover four by four, and 2000 Volkswagen Beetle." In December 2001, D S obtained from the Bank a renewal of the line of credit it had obtained in 1999. Dawkins executed a promissory note in the amount of $50,999.90 in favor of the Bank.
In February 2002, Dawkins and Mr. Helms moved several of the vehicles to a location in Pell City, Alabama. In late February 2002, one of the vehicles, the 1997 Mazda Millenia, sold. Although he received a check for the amount for which the Millenia was sold, Dawkins did not pay to the Helmses the amount that they were due from the sale per their agreement. After the 1997 Mazda Millenia was sold, Mr. Helms, with the help of two other individuals, traveled to the Pell City location and took possession of the 2000 GMC truck and the 2001 Lincoln Continental that had been placed there.
On March 27, 2002, the Helmses initiated the present action against Dawkins. Their complaint alleged a claim of breach of contract and asserted that the Helmses were entitled to the funds from the sale of the 1997 Mazda Millenia, as well as possession of the six remaining vehicles. In a separate document filed the same day, the Helmses prayed for both a temporary re-straining order and a preliminary injunction preventing Dawkins from expending the funds received from the sale of the 1997 Mazda Millenia and from selling or damaging the other vehicles remaining in his possession. They also filed a motion for a writ of seizure, requesting an order seizing the vehicles remaining in Dawkins's possession.
The following day, the court entered a preliminary injunction preventing any of the parties from disposing of the vehicles at issue in the case or from disposing of any proceeds derived from their sale. The court also entered an order for a writ of seizure, ordering the sheriff to seize any of the vehicles at issue in the case remaining in Dawkins's possession. *Page 1066 
After the Helmses initiated this litigation, Dawkins visited Steve Stevens, the Bank's president, and informed him of the litigation. He also turned over to Stevens replacement titles he had obtained on three of the vehicles.
On April 24, 2002, Dawkins answered the complaint and filed a counterclaim alleging breach of contract.
Thereafter, on July 24, 2002, the Bank moved to intervene in the case and filed a claim in intervention, asserting that it possessed a valid security interest in the vehicles at issue in the case and that its security interest was superior to the Helmses' claim to the vehicles. It alleged that Dawkins was in default on the promissory note he had executed in the Bank's favor and that he owed $53,689.56, with interest accruing at a rate of approximately $15.50 per day beginning on July 16, 2002. It demanded recovery of the vehicles. The court granted the Bank's motion to intervene on September 4, 2002.
On October 30, 2002, the court held a bench trial on the claims. On November 14, 2002, it entered an order finding the following facts:
 "1. That the Plaintiffs, Gerald and Johnnie Helms entered into an agreement with Defendant, William T. Dawkins wherein the Plaintiffs fronted money for the purchase of certain vehicles. Defendant was to sell the vehicles and repay the Plaintiffs from such proceeds. The Court finds that the Plaintiffs did in fact front or advance the money used to purchase the seven vehicles involved in this case.
 "2. That Defendant sold one of the seven vehicles, a 1997 Mazda [Millenia], but failed to repay the Plaintiffs as agreed. The agreement on this particular vehicle was that the Plaintiffs be repaid the amount of Three Thousand and Eighty Dollars ($3,080.00), plus the cost of repairs paid by the Plaintiffs, in the sum of One Thousand Sixty Four Dollars and Ninety-Nine Cents ($1,064.99).
 "3. That the Intervener, Peoples Community Bank, did not give value for the vehicles that are the subject of this case. The business relationship between the Defendant and the Intervener had deteriorated from its start in 1998. Defendant is in serious default of his loan with Intervener. The Court finds that the intent of the agreement between Intervener and Defendant was the Intervener would forward money to Defendant for purchase of certain vehicles. Those vehicles would be secured by the promissory note executed by Defendant. The Court further finds that none of the vehicles in question were purchased with Intervener's money. That its intervention in this case was for collection purposes and not to preserve liens on specific vehicles which its money had procured."
The court then held:
 "A. The Plaintiffs are hereby awarded ownership of the six vehicles currently held by the Barbour County Sheriff's Department and subject to the Writ of Seizure. Those vehicles are further identified as follows:

"2001 Mazda [Millenia] VIN JM1TA221611701245
"2000 BMW VIN WBAAM5346YFR18801
"2001 Honda Civic VIN 2HGES16561H581575
"1995 Chevrolet Tahoe VIN 1GNEK18K4SJ333513
"2001 Lincoln Continental VIN 1LNHM97VX1Y651602
"2000 CMC Pick-Up VIN 1GTGK29U4YE406937

 "The Defendant shall endorse the current titles to Plaintiff Johnnie Helms. This execution shall perfect the purchase money security interest in the vehicles for the Plaintiffs as per the intent of the Defendant and Plaintiffs. Said endorsement shall be made within ten (10) days of this Order. Failing therein, the Clerk of this Court is *Page 1067 
authorized and directed to execute said titles in the name and stead of Defendant.
 "B. The Plaintiffs shall sell the vehicles in a commercially reasonable manner. The Plaintiffs shall keep records of all sales and costs of repairs. These figures will be filed with the Court. Any sum of money recovered by the Plaintiffs in excess of their investment plus necessary repairs shall be surrendered to Intervener as payment for Defendant on his promissory note. The Plaintiffs shall cooperate with Intervener in the sale of the vehicles and shall keep Intervener informed of the progress of the sales.
 "C. The Court awards judgement in favor of Plaintiffs and against Defendant for Four Thousand One Hundred Forty-Four Dollars, and Ninety-Nine Cents ($4,144.99) which figure represents the cost of the vehicle plus repairs of the 1997 Mazda [Millenia]. Defendant was previously ordered not to expend these proceeds in the Writ of Seizure in this case. Said funds shall be paid to the Plaintiffs or to the Court within ten (10) days of this Order.
 "D. The Counterclaim of the Defendant is dismissed."
On November 25, 2002, Dawkins and the Bank filed motions to alter, amend, or vacate the judgment, or, alternatively, for a new trial. On February 10, 2003, all of the parties executed a document in which they expressed their consent to allow the postjudgment motions to remain pending more than 90 days from the date on which they were filed.
The court held a hearing on the post-judgment motions on December 7, 2004. On January 24, 2005, the court entered an order denying those motions. The order stated, in pertinent part:
 "Steve Stevens, City President of Peoples Community Bank, testified that his Bank had a floor plan agreement with Defendant. Any vehicle purchased by Defendant automatically became subject to the floor plan. During his testimony, Stevens produced a set of vehicle titles for the same set of vehicles. The Bank's titles were marked replacement titles. This Court then had two sets of titles in evidence for the same vehicles. The testimony showed that Intervener advanced money to Defendant based on the replacement titles. Stevens further testified that he had knowledge that Defendant was severally [sic] past due on his loan to the bank. Stevens was also aware of Defendant's poor reputation in the community for honesty and trustworthiness. Stevens also testified that the Bank's relationship with Defendant had steadily deteriorated from its inception in 1998. The Court believes that from the evidence presented that Defendant was present when Plaintiffs took possession of the vehicle titles in March of 2002. The Court further finds that Defendant was deceptive if not criminal in securing the replacement titles. Most of the replacement titles were issued after the filing of the Complaint and even after the Order of Writ of Seizure. The Court further finds that Defendant committed a fraud upon the Bank by providing the Bank replacement titles when Defendant knew the location of the original titles. The Court finds that neither the Defendant nor the Bank provided the funds to purchase the vehicles. Evidence produced showed that Plaintiffs had paid for the purchase of all the vehicles.
 "As to Intervener, Peoples Community Bank, the Court finds that the Bank was aware of Defendant's financial status and community reputation. The *Page 1068 
Court finds that the Bank relied upon the fraudulent conduct of its customer, the Defendant. The Court agrees that the replacement set of titles presented to the Bank were properly secured. However, the replacement titles should have raised a red flag as to the reliability of the titles based on the financial status and their personal knowledge of Defendant. The Court finds that the replacement set of titles were fraudulently obtained by Defendant. Stevens testified that the bank did not wish to criminally prosecute their own client. The court considered this testimony in its decision as the Bank could have and still may file criminal charges against Defendant.
 "In the Order of this Court dated November 14, 2002, the vehicles were awarded to the Plaintiffs and they were to be sold. Any amount over the Plaintiffs investment and repairs was to be awarded to the Bank. Defendant's counterclaim for breach of contract against Plaintiffs was dismissed. Both Defendant and Intervener filed post trial motions and all parties agreed in writing to waive the statutory time to rule on these motions.
 "After the sale of the last vehicle, this Court heard the post trial motions on December 7, 2004. After considering the oral and written arguments, the court hereby denies the motions.
 "As to the final distribution of funds, this Court finds that Plaintiffs expended the amount of $66,630.00 plus repairs in the amount of $4,612.33. The vehicles sold and Plaintiffs were able to recover the amount of $38,144.99. The BMW vehicle was unable to be sold and was assigned a value of $3,500.00 for purposes of this accounting. Therefore, the court awards the Plaintiffs the amount of $38,144.99 and the BMW with a value of $3,500.00 and a judgment against the Defendant for the balance of unrecovered funds totaling $19,597.34. This Court refuses to allow the Bank to profit from a fraud committed by its own client at the expense of an innocent third party which gave value for the vehicles. The Intervener, Peoples Community Bank, is free to seek other civil or criminal remedies for collection of their note executed by Defendant."
The Bank appeals.
The Bank contends that it had a valid, perfected security interest in the seven vehicles at issue in this case. Thus, according to the Bank, the trial court erred when it awarded the vehicles, and the proceeds from the sales of those vehicles, to the Helmses. The Helmses respond by arguing that the trial court correctly awarded them the seven vehicles and the proceeds from the sale of the vehicles because, as the trial court held, the Bank's advances to Dawkins were limited to the purchase of other vehicles not presently at issue and, thus, the seven vehicles at issue in this case were not covered by the Bank's security agreement with Dawkins.
The trial court's judgment is premised on its findings that (1) the Bank's and D S's intent with regard to the security agreement was that the Bank would have a security interest only in those vehicles with respect to which it had provided purchase-money financing, and (2) the Bank "did not give value for the vehicles." The trial court's analysis in this regard is flawed.
The security agreement between the Bank and D S provided that the Bank would have a security interest in all of D S's presently existing and future inventory that it held or would hold for sale. The language employed in the agreement was unambiguous and plainly provided that all of D S's inventory was *Page 1069 
subject to the agreement. Because the language of the agreement was unambiguous, the trial court should have determined the Bank's and D S's intentions by referencing only the language expressed therein, without resort to any surrounding circumstances. See H.R.H. Metals, Inc. v.Miller ex rel. Miller, 833 So.2d 18, 24 (Ala. 2002).See also Peppertree Apartments, Ltd. v. PeppertreeApartments, 631 So.2d 873, 880 (Ala. 1993) ("The intention of the parties to a note or other contract is to be determined from the contract itself, where the contract is plain and unambiguous."); and American Nat'l Bank Trust Co. ofMobile v. Robertson, 384 So.2d 1122, 1125
(Ala.Civ.App. 1980) ("[A] security agreement is effective according to its terms."). In other words, the trial court was not authorized to ascribe to the security agreement a meaning at odds with its plain language.
The next question presented is whether the Bank gave value for the security interest it obtained in the vehicles. The giving of value is one of the three elements that must be present for a security interest to be enforceable. See
former § 7-9-203(1), Ala. Code 1975.[1]
Former § 7-9-204, Ala. Code 1975, which was in force until January 1, 2002, provided:
 "(1) Except as provided in subsection (2), a security agreement may provide that any or all obligations covered by the security agreement are to be secured by after-acquired collateral.
 "(2) [Subsection (2) deals with consumer goods, which are not at issue in the present case.]
 "(3) Obligations covered by a security agreement may include future advances or other value whether or not the advances or value are given pursuant to commitment. . . ."[2]
Former § 7-1-201(44), Ala. Code 1975, defined "value" as follows:
 "`Value.' Except as otherwise provided with respect to negotiable instruments and bank collections . . . a person gives `value' for rights if he or she acquires them:
 "(a) In return for a binding commitment to extend credit or for the extension of immediately available credit whether or not drawn upon and whether or not a charge-back is provided for in the event of difficulties in collection; or
 "(b) As security for or in total or partial satisfaction of a preexisting claim; or
 ". . . .
 "(d) Generally, in return for any consideration sufficient to support a simple contract."[3]
Based on the foregoing statutes, we hold that the Bank provided value when it made a commitment to extend credit, and when it made actual advances to D S pursuant to that commitment.See Southern Ready Mix, Inc. v. AmSouth Bank,576 So.2d 188, 189-91 (Ala. 1991). The trial court's holding to the contrary is in error.[4] *Page 1070 
The Helmses also argue in their brief:
 "[T]he evidence shows that although [the Bank] was well aware of Dawkins'[s] account being severely past due, at no time did it put said account in default in an effort to collect the pledged collateral under the security agreement, which was still available. Instead, [the Bank], with knowledge of Dawkins's financial status and reputation in the community for dishonesty, accepted as substitution collateral replacement titles from Dawkins without inquiry into the same. More importantly, [the Bank] accepted said substitution collateral after having learned of the pending litigation between the Helms[es] and Dawkins. As such, it is clear that [the Bank] wrongly relied upon the fraud of its own customer, Dawkins, and it did so for the sole purpose of gaining a better position — i.e., to get the [B]ank out of a bad situation. In other words, [the Bank] is trying to benefit from the Helms[es]' misfortune."
(Footnote omitted.) The Helmses have not explained to this court, and they have provided no legal authority demonstrating, why the above-stated facts, even if they were supported by the evidence, would serve to defeat the Bank's security interest in all of D S's inventory.
For the foregoing reasons, the trial court's judgment is reversed, and the cause is remanded for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
CRAWLEY, P.J., and THOMPSON, PITTMAN, and BRYAN, JJ., concur.
[1] Effective January 1, 2002, former § 7-9-203(1) was replaced by § 7-9A-203(b).
[2] Effective January 1, 2002, former § 7-9-204 was replaced by § 7-9A-204.
[3] Effective January 1, 2005, former § 7-1-201(44) was replaced by § 7-1-204.
[4] As a separate matter, the trial court, in its November 2002 order, made a passing reference to a purchase-money security interest of the Helmses in the seven vehicles. The court, however, did not expressly reach the questions whether any such security interest actually existed or was enforceable or whether the Helmses' asserted interest took priority over the Bank's security interest. We do not reach those questions here.